Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Jul 31 2012, 8:49 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KRISTINA J. JACOBUCCI**
La Porte, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MELISSA BRUCE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 46A03-1110-CR-476 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAPORTE SUPERIOR COURT
The Honorable Kathleen B. Lang, Judge
Cause No. 46D01-0809-FA-149

**July 31, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Defendant, Melissa Bruce (Bruce), appeals her sentence for neglect of a dependent, a Class B felony, Ind. Code §§ 35-46-1-4, -35-41-2-4.

We affirm.

ISSUE

Bruce raises three issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court properly sentenced her.

FACTS AND PROCEDURAL HISTORY

S.P. was the daughter of Bruce and David Pioch (Pioch). Bruce and Pioch were married from December of 2001 to July of 2008, and S.P. was born in November of 2003. Throughout Bruce and Pioch's marriage, there were incidents of domestic abuse. Bruce reported to Dr. Karla Fischer (Dr. Fischer), a research-based psychologist, that from the start of their marriage Pioch physically abused her by methods such as punching, slapping, pushing, or grabbing her, and also verbally abused her. She told Fischer that approximately nine months before the end of their marriage, she threatened to leave Pioch. Thereafter, Pioch's abuse escalated, both in frequency and severity. He also started using surveillance tools to keep track of her.

In December of 2007, Pioch accused Bruce of having an affair because on her birthday she told him that she was going to celebrate with her sister at a hotel, but instead the video surveillance he had placed in her car led him to believe that she was meeting another man at the hotel. Pioch confronted Bruce, struck her with his hand, and verbally

2

abused her. As a result, Bruce ran out of their house and called the police. The police arrested Pioch and charged him with domestic battery as a Class A misdemeanor.

In February of 2008, Pioch was again arrested for abusing Bruce and was charged with domestic battery as a Class A misdemeanor. Following this incident, Bruce left Pioch and moved into a domestic violence shelter along with S.P. and her other child, L.P. About four months later, Bruce entered into a relationship with Scott Bruce (Scott), whom she met on an internet dating website. Bruce and Scott met in person for the first time over the Fourth of July holiday in 2008 and were married a month later in August of 2008. Bruce, S.P., and L.P. moved into Scott's apartment, where he lived with his four children from a previous marriage.

Scott had a temper and frequently abused his four children from his previous marriage. He was also a strict disciplinarian. His children testified that at times he would require them to stand in a corner for up to an hour and a half for disobedience. When Bruce and her children moved into Scott's apartment, he took over some of the responsibility for disciplining her children, and would use a "TENS" electric shock device to punish them. (Transcript p. 46). He punished S.P., in particular, because she was four years old and was having trouble potty training.

On Friday, September 12, 2008, S.P. soiled her pants before reaching the toilet. Bruce and Scott entered the downstairs bathroom with S.P., and Scott started yelling at S.P. and hitting her in the head. S.P. fell to the floor and suffered extreme pain. Subsequently, Bruce and Scott put S.P. in their upstairs bedroom.

3

The following morning, S.P.'s eyes were swollen shut, and her face and head were bruised, puffy, and purple. Bruce and Scott put socks over S.P.'s hands, and Scott tied S.P. in a blanket to keep her from moving. Over the next six days, Bruce did not provide S.P. with any type of medical treatment for her injuries. According to Bruce, she did not do so because she was afraid of how to explain what had happened to S.P. Nevertheless, over the six days Scott and Bruce visited with neighbors and drank as if nothing had happened.

On Sunday, S.P. had diarrhea and began vomiting. According to Bruce, this may have been from eating her own feces. On Monday, S.P. was no longer vomiting and was able to take a small amount of food and drink. Still, over the next few days she ate very little and was unable to sit up on her own. On Wednesday, Scott tied S.P. down and bound her feet and lower legs together. That night, S.P. rolled around the room, knocked over a lamp, and at one point ended up on top of a safe. S.P. whined during the night, and Bruce reacted by getting her some water. Bruce noticed that S.P. smelled badly, but she did not know why. At some point during the week, Scott and Bruce put an air sanitizer in the room because of the smell.

On Thursday, S.P. was very weak, markedly thinner, and her eyes were still swollen shut. Scott put an ace bandage around the blankets surrounding S.P. That day, S.P. slept a lot and again rolled around the bedroom. When Scott and Bruce gave her a bath later that evening, her body was limp. The smell was so bad that Bruce thought she would vomit. S.P.'s hair was falling out, and there was discharge coming out of her

mouth.  During the week, Bruce had also noticed pus coming from S.P.'s head.  Before Bruce and Scott went to bed, Scott propped S.P. up so that she was sitting upright.  Unlike the preceding evenings, S.P. did not wake Bruce up during the night by whining and whimpering.

When Bruce got up Friday morning, she checked to see if S.P.'s face was uncovered, but did not check to see if she was breathing.  Bruce then went downstairs and slept for about an hour.  She woke up to Scott yelling at her to call 911 because S.P. was not breathing.  Scott began trying to resuscitate S.P. and called 911.  Emergency medical personnel arrived a short time later and found that S.P. had died.  The exact time of death is unknown, but the cause of death was determined to be strangulation.  When Detective Anthony McClintock searched the apartment on Friday afternoon, he noticed a strong smell of decay, particularly upstairs.

On September 23, 2008, the State filed an Information charging Bruce with one Count of neglect of a dependent as a Class A felony, I.C. §§ 35-46-1-4(a)(1), -35-41-2-4; and two Counts of neglect of a dependent as Class B felonies, I.C. §§ 35-46-1-4(a)(1), -35-41-2-4.  On February 4, 2011, the State filed an Amended Information charging Bruce with neglect of a dependent as a Class B felony, and Bruce pled guilty to the amended charge pursuant to a plea agreement.

On April 21, 2011 and May 16, 2011, the trial court held a sentencing hearing.  At the hearing, Dr. Fischer explained that as a result of the pattern of violence and abuse that Bruce had experienced at the hands of Pioch and Scott, she exhibited symptoms of post

5

traumatic stress disorder, as well as three symptoms associated with battered women's syndrome: learned helplessness, perceived inability to escape, and an inability to trust her own perceptions and judgments. Fischer testified that Bruce's "experience of domestic violence and the symptoms of battered women's syndrome prevented her from understanding the significance of [S.P.'s] injuries and prevented her from taking an active action to get the child to help that would have saved her life." (April 21, 2011 Tr. p. 143).

Similarly, clinical psychologists Dr. Alan Jaffe (Dr. Jaffe) and Dr. Bruce Frumkin (Dr. Frumkin) found that Bruce suffered from dependent personality disorder, anxiety, and depression. Dr. Jaffe explained that individuals who suffer from dependent personality disorder have difficulty making everyday decisions, difficulty expressing disagreement, and demonstrate a lack of self-confidence. Dr. Jaffe found that Bruce had a desperate need to be attached to Scott as a result of her dependent personality disorder and her ability to objectively assess the information that she received from him was undermined as a result of that need.

At the conclusion of the evidence, the trial court took the matter under advisement. Subsequently, on June 16, 2011, the trial court sentenced Bruce to twenty years executed in the Indiana Department of Correction. As mitigating factors, the trial court acknowledged Bruce's arguments that: (1) she did not have a criminal history; and (2) her dependent personality disorder and symptoms of battered women's syndrome and post traumatic stress disorder offered some explanation for her actions during the last

6

week of S.P.'s life. However, the trial court stated that the disorders "in no way excuse[d] or justif[ied] [Bruce's] role in the death of her daughter[.]" (Appellant's App. p. 196). Instead, the trial court found the following aggravating factors: (1) S.P. was less than twelve years old; (2) the crime was committed in the presence or hearing of individuals who were less than eighteen years old; (3) Bruce was in a position of care, custody, or control of S.P.; and (4) the harm and injury S.P. suffered was significant and greater than the elements necessary to prove the commission of the charged offense. On July 15, 2011, Bruce filed a motion to correct error and on September 19, 2011, the trial court denied the motion.

Bruce now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *The Trial Court's Consideration of Aggravating and Mitigating Factors*

Bruce argues that the trial court abused its discretion in sentencing her to the maximum term of incarceration for a Class B felony because it inappropriately identified the aggravating and mitigating factors. Preliminarily, we note that sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of that discretion. *Laster v. State,* 956 N.E.2d 187, 193 (Ind. Ct. App. 2011). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

Under a previous Indiana sentencing scheme, trial courts were required to properly weigh mitigating and aggravating factors. *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind.

7

2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). Now, under the advisory sentencing scheme, trial courts no longer have such an obligation. *Id.* Instead, "once the trial court has entered a sentencing statement, which may or may not include the existence of aggravating and mitigating factors, it may then 'impose any sentence that is . . . authorized by statute; and . . . permissible under the Constitution of the State of Indiana.'" *Id.*; *see also* I.C. § 35-38-1-7.1(d) (stating that a court may impose any sentence authorized by statute "regardless of the presence or absence of aggravating circumstances or mitigating circumstances.").

## A. *Aggravating Factors*

In imposing the maximum sentence on Bruce, the trial court found as an aggravating factor that Bruce was in a position of care, custody, or control of S.P. Bruce now argues that this aggravating factor was inappropriate as it was also an element of the offense. Pursuant to I.C. § 35-46-1-4, an individual commits neglect of a dependent if the person has care of the dependent, "whether assumed voluntarily or because of a legal obligation, [and] knowingly or intentionally [] places the dependent in a situation that endangers the dependent's life or health." The Indiana Code further defines dependent as "an unemancipated person who is under eighteen (18) years of age." I.C. § 35-46-1-1.

We have previously held that a fact that constitutes a material element of an offense may not also constitute an aggravating circumstance to support an enhanced sentence. *Blixt v. State,* 872 N.E.2d 149, 152 (Ind. Ct. App. 2007). However, a trial court may properly consider the particularized circumstances of the material elements of

8

the crime. *Id.* Here, the trial court noted that not only was S.P. within Bruce's care and control, but it was a particularized type of care and control—that of a parent and child. As the trial court commented, "[Bruce] is [S.P.'s] mother, not only in a position of care and custody, but a relationship that should be one of love and tenderness, and an unwavering desire to care and protect. Instead, on more than one occasion, [Bruce] said she wished [S.P.] had never been born." We agree and conclude that the trial court did not abuse its discretion in considering Bruce's position of custody and care of S.P. an aggravating factor because Bruce's relationship with S.P. was one that was particularized beyond a general position of custody and care.

Furthermore, a single aggravating circumstance is adequate to support the enhancement of a sentence. *Duncan v. State,* 862 N.E.2d 322, 325 (Ind. Ct. App. 2007), *trans. denied.* As the trial court found three additional aggravating circumstances that Bruce does not dispute, we conclude that there were sufficient aggravating factors supporting Bruce's enhanced sentence even absent the trial court's finding that S.P. was in Bruce's custody and care.

### B. *Mitigating Factors*

Bruce also argues that the trial court failed to consider the following mitigating factors: (1) her lack of a criminal history; (2) her experience of domestic violence and symptoms of battered women's syndrome, which she claims were substantial grounds tending to excuse or justify her conduct; (3) that the crime was the result of circumstances unlikely to recur; (4) that she is likely to respond affirmatively to

9

probation or short term imprisonment; (5) that she is unlikely to commit another crime; and (6) that she pled guilty and accepted responsibility for her conduct.

In order to show that a trial court failed to identify or find a mitigating factor, a defendant must establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer,* 868 N.E.2d at 493. Although a failure to find mitigating circumstances clearly supported by the record may imply that the trial court improperly overlooked them, the trial court "is not obligated to explain why it has chosen not to find mitigating circumstances. Likewise, the court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor." *Id.*

Contrary to Bruce's arguments, it is clear from the transcript that the trial court did consider her lack of criminal history and her symptoms of battered women's syndrome. In its sentencing statement, the trial court stated: "As [Bruce] points out, she has no legal history and led a law-abiding life before the commission of this crime." (Tr. p. 195). The trial court also stated:

> The manner of [S.P.'s] death is hard, if not impossible to understand. The fact that [Bruce] has been diagnosed with Dependent Personality Disorder and may suffer from symptoms of Battered Women's Syndrome and Post Traumatic Stress Disorder offers at least some explanation for what [Bruce] did and didn't do during the last week of [S.P.'s] life. It in no way excuses or justifies her role in the death of her daughter, [S.P.].

(Tr. p. 196). From these statements, it is clear that the trial court did consider the proffered mitigating circumstances but declined to consider them mitigating factors. As the trial court "is not obligated to explain why it has chosen not to find mitigating circumstances" and "is not obligated to accept the defendant's argument as to what

10

constitutes a mitigating factor," we conclude that the trial court did not abuse its discretion in declining to find Bruce's lack of criminal history or symptoms of battered women's syndrome mitigating factors. *See Anglemyer,* 868 N.E.2d at 493.

Likewise, Bruce's counsel argued in his closing statement that "Dr. Fischer told you the rate of recidivism is low. It's low." (Tr. P. 156). Because the defense counsel made that statement, it is clear that the trial court considered whether the circumstances that led to Bruce's conviction were likely to recur and whether she was likely to commit another crime. Yet, the trial court declined to find those as mitigating factors. Because the trial court is not required to accept a defendant's argument as to what constitutes a mitigating factor, we conclude that the trial court did not abuse its discretion. *See Anglemyer,* 868 N.E.2d at 493.

With respect to Bruce's decision to plead guilty, we have previously noted that "[a] guilty plea is not necessarily a mitigating factor where the defendant receives a substantial benefit from the plea or where evidence against the defendant is so strong that the decision to plead guilty is merely pragmatic." *Amalfitano v. State,* 956 N.E.2d 208, 212 (Ind. Ct. App. 2011), *trans. denied.* Here, Bruce was originally charged with three Counts: one Count of neglect of a dependent as a Class A felony and two Counts of neglect of a dependent as Class B felonies. A Class A felony charge carries a sentencing range of 20 years to 50 years with an advisory sentence of 30 years, and a Class B felony carries a sentencing range of 6 years to 20 years with an advisory sentence of 10 years. I.C. §§ 35-50-2-4, -5. In exchange for Bruce's agreement to plead guilty to a single

11

Count of neglect of a dependent as a Class B felony, the State filed an Amended Information dismissing the other two Counts. As the sentencing maximum for a Class B felony is thirty years less than the sentencing maximum for a Class A felony, Bruce received a substantial benefit from this plea agreement. Thus, we cannot say that the trial court abused its discretion in declining to find Bruce's plea as a mitigating factor.

Finally, Bruce argues that the trial court abused its discretion when it failed to consider Dr. Fischer's testimony that she is likely to respond affirmatively to probation or short term imprisonment as a mitigating factor. First, we would like to note that while defense counsel requested that the trial court "[f]ashion a sentence that's consistent with addressing her needs in the most judicious way" and noted that the sentence did not have to be twenty years because dependent personality disorder and battered women's syndrome are treatable, defense counsel never mentioned Dr. Fischer's recommendation regarding probation or short term imprisonment in his closing argument. (Tr. p. 155). Instead, it is apparent that defense counsel did not advocate for a "short" term of imprisonment and probation. Counsel ultimately advocated for the presumptive sentence for a Class B felony—ten years. Counsel cannot now change this request.

Moreover, in support of this proposed mitigating factor, Bruce only offered the opinion testimony of Dr. Fischer. Dr. Fischer's testimony was based only on Bruce's self-reports and one interview with Bruce's father. Thus, we cannot say that the evidence supporting this conclusion is so "significant" that the trial court abused its discretion in declining to find it a mitigating factor. *See Anglemyer,* 868 N.E.2d at 493.

12

## II. *Nature of the Offense and Character of the Offender*

Next, Bruce argues that the trial court inappropriately sentenced her in light of her character and the nature of the offense. Under Indiana Appellate Rule 7(B), this court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Childress v. State,* 848 N.E.2d 1073, 1079-80 (Ind. 2006). Although this court is not required to use "great restraint," we nevertheless exercise deference to a trial court's sentencing decision, both because Appellate Rule 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective a trial court has when making decisions. *Stewart v. State,* 866 N.E.2d 858, 865-66 (Ind. Ct. App. 2007). The "principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). In addition, the defendant bears the burden of persuading this court that his or her sentence is inappropriate. *Childress,* 848 N.E.2d at 1080.

Bruce notes previous appellate court decisions in which we have held that "[m]aximum sentence enhancements should be reserved for the very worst offenses and offenders." *Brown v. State,* 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans. denied.* As we noted above, Bruce did receive the maximum sentence for a Class B felony. *See* I.C. § 35-50-2-5. However, we have often stated that "[i]f we were to take this language

literally, we would reserve the maximum punishment for only the single most heinous offense." *Brown*, 760 N.E.2d at 247. Instead, "we should concentrate less on comparing the facts of [a] case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character." *Id.*

Here, we recognize that Bruce does not have a criminal history and has suffered from dependent personality disorder, post-traumatic stress disorder, and domestic abuse, which has resulted in symptoms of battered women's syndrome.

However, regardless of any evidence in support of Bruce's character, the nature of her offense was particularly disturbing and egregious, which places her squarely within the category of "worst offenders." *See Brown*, 760 N.E.2d at 247. By her own admission, Bruce kept S.P. shut in her bedroom for six days, first wrapped up in a blanket to keep her from moving, and then later further bound within the blanket by an Ace bandage. Throughout this time, Bruce noticed a bad smell, to the point that she wanted to vomit, noticed that S.P. was losing hair, had discharge coming out of her mouth, had pus coming from her head, and was in extreme pain. Moreover, S.P.'s body was covered in bruises, her face and head were bruised, puffy, and purple, and her eyes were swollen shut. Bruce even attributed S.P.'s vomiting to the fact that she might have eaten her own feces. Still, Bruce failed to seek medical attention for S.P., and S.P. ultimately died as a result of her injuries. In light of these facts, we cannot conclude that the nature of Bruce's offense warrants a reduction of her sentence. Even though we are not required to

14

find a hypothetical "worse offense," it is hard to imagine one that is worse than the offense here. Thus, we determine that the trial court's sentence was appropriate in light of Bruce's character and the nature of her offense.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly sentenced Bruce.

Affirmed.

NAJAM, J. and DARDEN, S. J. concur